IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

JUAN DOMINGUEZ,                          )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )          Case No. CIV-21-653-SLP
                                         )
WEISER SECURITY SERVICES, INC.,          )
                                         )
          Defendant.                     )

**O R D E R**

Before the Court is the Motion for Summary Judgment [Doc. No. 27] filed by

Defendant Weiser Security Services, Inc. ("Weiser").  It is at issue.[1]  *See* Pl.'s Resp.

[Doc. No. 46]; Def.'s Reply [Doc. No. 54].  For the following reasons, the Motion is

GRANTED.

## I.    Governing Standard

Summary judgment is appropriate if there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  A dispute is only genuine  "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238,

1251 (10th Cir. 2015) (quoting  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  And a fact is only material if it "might affect the outcome of the suit under the

governing law." *Id.* (quoting  *Anderson*, 477 U.S. at 248).  The Court's function at the

summary judgment stage is not to weigh the evidence, but to determine whether there is a

_____

[1] Plaintiff also filed an Application to Set Defendant's Summary Judgment Motion for Oral
Argument [Doc. No. 60].  That motion is DENIED as moot.

genuine issue for trial.  *Anderson*, 477 U.S. at 249; *see also Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018).  In doing so, the Court "view[s] the factual record and draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).  The Court may grant summary judgment if the nonmovant comes forward with evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 249.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II.    <u>**Undisputed Material Facts**</u>[2]

Defendant Weiser is a corporation that provides commercial security services.[3]  In the fall of 2018, Weiser began providing security services to Halliburton at its Duncan, Oklahoma location.  Around that same time, Weiser hired Plaintiff as a day shift supervisor.  Plaintiff, who oversaw Weiser security guards stationed at Halliburton's

---

[2] The Court includes facts that are material, supported by the summary judgment record, and not genuinely disputed.  *See* Fed. R. Civ. P. 56(c).  The Court omits facts that are supported only by otherwise inadmissible evidence, as detailed below.

[3] In reciting its 55 undisputed facts, Defendant regularly fails to provide appropriate pinpoint citations to multi-page exhibits.  *See, e.g.*, Def.'s UMF ¶ 15 (quoting from Exhibits 8 and 9 without specificity); Def.'s UMF ¶ 16 (citing Exhibit 9 without specificity); Def.'s UMF ¶¶ 18–21 (citing Exhibit 8 without specificity).  This practice, which violates both the Federal Rules of Civil Procedure and this Court's Local Civil Rules, needlessly wastes time and judicial resources.  *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring "cit[ations] to particular parts of materials in the record"); LCvR 56.1(d) (same).

Duncan site, reported to site manager Joseph Yates.  Mr. Yates, in turn, reported to Texas-based branch manager Mike Strickland.

At all relevant times, Chip Ford worked for Halliburton as the Duncan facility's security manager.  Halliburton, as Weiser's client, expected Weiser personnel to follow Halliburton's safety rules.  Part of Plaintiff's duties as supervisor at the Halliburton site included following Halliburton's procedures and maintaining its satisfaction with Weiser's services.  He was also responsible for providing medical and safety training—including First Aid, CPR, and defibrillator training—to Weiser employees at the Halliburton site.

Mr. Yates, Plaintiff's direct supervisor, began taking medical leave at some point in 2019.  During Mr. Yates's absence, Plaintiff met with Mr. Ford, Mr. Strickland, and Weiser VP Robert Bullock to report that Mr. Yates favored female employees.  This report, which was made sometime before Mr. Yates returned from leave in January or February 2020, is not the basis of Plaintiff's retaliation claim.  *See* Compl. [Doc. No. 1] ¶ 10 ("On or around June 10, 2020, Plaintiff participated in protected activity . . . .").  At some point while Mr. Yates was on leave, Plaintiff sent another employee home for being "like two minutes late."  Pl. Dep. [Doc. No. 27-2] at 95:4–10.

After Mr. Yates returned, Weiser put Plaintiff in charge of issues related to employee relations—a responsibility that had previously belonged to Mr. Yates.  Around that same time, Weiser issued its first and only "Officer of the Month" award to Plaintiff.  On or around June 2—after Mr. Yates returned from leave but before Plaintiff made the protected report at issue here—Mr. Yates told Plaintiff the two of them "had to get

aligned" and "had to start working together, because if [they] weren't going to work together it was going to be either [Plaintiff's] job or [Mr. Yates's] job."  Pl. Dep. [Doc. No. 46-1] at 161:1–162:1.

In April 2020, a Black security guard named Robert Culberson told Weiser's HR department that the company had discriminated against him because of his race.  Mr. Strickland and Mr. Ford were made aware of the complaint, and Weiser launched an investigation.[4]  Charlene Lee-Sutherlin, Weiser's VP of Human Resources, traveled to the Duncan location to interview employees as part of the investigation into Mr. Culberson's complaint.  She met with Plaintiff on June 10, 2020.

During this meeting, Plaintiff reported that Mr. Yates showed favoritism to female employees, particularly those who flirted with him.[5]  The majority of their conversation, however, focused on Mr. Culberson's complaint.  This was the first and only meeting between Plaintiff and anyone from Weiser's HR department prior to his termination. Plaintiff did not discuss the content of his conversation with Ms. Lee-Sutherlin with anyone else, but his comments echoed those he had previously made to Mr. Strickland, Mr. Ford, and Mr. Bullock during Mr. Yates's leave.  Ms. Lee-Sutherlin denies telling either Mr. Yates or Mr. Strickland about Plaintiff's comments.

---

[4] Plaintiff provides several additional facts related to Mr. Culberson's complaint of racial discrimination.  *See* Pl.'s Resp. to Def.'s UMF ¶ 40.  But because the substance of Mr. Culberson's complaint is not relevant to Plaintiff's retaliation claim, the Court finds it unnecessary to provide a detailed recitation of those facts.

[5] This report of gender discrimination is the subject of Plaintiff's retaliation claim.

Around the same time Ms. Lee-Sutherlin arrived to investigate Mr. Culberson's complaint, the COVID-19 pandemic prompted multiple changes around the Duncan site. For example, Weiser had implemented a mask mandate at Halliburton's request by some point in June 2020.[6]   *See, e.g.*, Pl. Dep. [Doc. No. 27-2] at 113:24–25 ("We were mandated to wear these masks."); *id.* at 124:8–18.   On June 5, Plaintiff was reminded to wear a mask.   *See* Pl. Dep. [Doc. No. 27-2] at 110:22–111:2.   That same day, Plaintiff left early to go get a COVID test due to a possible exposure.   He told Mr. Yates he had to leave for a personal matter before testing negative for the virus.

Similarly, Halliburton decided to begin implementing temperature checks in early June 2020 for all people entering the Duncan facility.   The temperature checks were slated to begin on Monday, June 15.   On Monday, June 8, Mr. Yates spent 10–15 minutes "skimm[ing] through" the training with Plaintiff and Justin Chasteen, another day shift security supervisor.   Pl. Dep. [Doc. No. 46-1] at 129:3–14.   Plaintiff and Mr. Chasteen were then responsible for training other Weiser security guards how to properly conduct temperature checks.   Plaintiff trained his security officers in the same manner that Mr. Yates had trained him.

On Wednesday June 10, the same day Plaintiff made his report, Mr. Ford sent Mr. Yates training materials and instructions for conducting temperature checks at the Duncan facility.   Plaintiff, Mr. Chasteen, and two other employees were copied on Mr. Ford's email.   Later that day, Mr. Yates emailed Weiser supervisors—including Plaintiff and Mr.

---

[6] The parties disagree about when Halliburton implemented a mask mandate.  This dispute is not material, so the Court need not address it.

Chasteen—reminding them that all officers needed to be properly trained on the temperature check process no later than the following day, June 11.   Mr. Yates immediately sent a second email to Plaintiff and Mr. Chasteen, reminding them to come in at 4:00 a.m. on Monday June 15 "to assist with the temperature checks."  [Doc. No. 27-13] at 1.   The email did not mention anything about additional training over the weekend.   Around the same time he sent this second email, Mr. Yates called Plaintiff "yelling at [him] in a rude way and [] telling [him] that [he] needed to have all this training done."  Pl. Dep. [Doc. No. 27-2] at 136:4–8.

The following day, June 11, Mr. Yates met with Ms. Lee-Sutherlin as part of her investigation into Mr. Culberson's complaint.  She told Mr. Yates that "he was part of the investigation and a complaint."  Lee-Sutherlin Dep. [Doc. No. 46-3] at 37:21–25.  Mr. Yates told her that "a bulk of the issues were coming up" with Plaintiff, and that he believed Plaintiff did not like him.  *Id.* at 79:11–18.

On Friday, June 12, Mr. Yates told Plaintiff and Mr. Chasteen "to retrain everybody" that same afternoon because all of the officers "needed extra training."  Pl. Dep. [Doc. No. 27-2] at 138:23–139:9.  Mr. Yates forwarded his first June 10 email to Mr. Strickland and explained that he sent the email after he learned that "[Plaintiff] hadn't gone over the training" with three of the officers.  [Doc. No. 27-16] at 1.  Mr. Yates claimed he reviewed the list of untrained officers with Plaintiff and instructed him to "make sure that all officers on his shift were capable of performing the duties for the

temperature checks."[7]  *Id.*  Again, this email did not mention anything about additional weekend training the following day.  On or around this same date, Mr. Ford told Mr. Strickland "that he was very upset that the Weiser security guards on site had not been sufficiently trained" to perform the temperature checks ahead of the June 15 rollout.[8] Strickland Dec. [Doc. No. 27-1] ¶ 4.  Mr. Ford also told Mr. Strickland he was unhappy with Plaintiff's failure to wear a mask and promptly report his COVID-19 exposure.  *Id.* ¶ 8; *see also* Lee-Sutherlin Notes [Doc. No. 27-15].

The following day, Saturday June 13, Mr. Yates and Mr. Strickland went to the Halliburton facility to complete temperature check training.  Plaintiff, who usually had Saturdays off, was not present, nor was Mr. Chasteen.  Mr. Strickland believed that Mr. Yates had ordered Plaintiff and Mr. Chasteen to report, so he thought they simply neglected to show up.  To the contrary, Mr. Yates never told either supervisor to attend.[9] Mr. Strickland did not discuss this event with Plaintiff prior to his termination.

Mr**.** Strickland claims he made the decision to terminate Plaintiff on June 16, 2020, a few days after the Saturday training.  Mr. Strickland cites several reasons for his

---

[7] Plaintiff does not dispute the existence of this email but contends the statements contained within it are false—i.e., that Mr. Yates did not review any list of untrained officers, and Plaintiff did not fail to train officers.

[8] Plaintiff objects to the portions of Mr. Strickland's declaration that include Mr. Ford's statements as inadmissible hearsay.  The Court addresses that issue below.

[9] Plaintiff has proffered evidence that he was never told to attend this training.  *See, e.g.*, Pl. Dep. [Doc. No. 46-1] at 143:23–144:5 ("I was never given any indication to show up that Saturday."). Weiser submits Mr. Yates's notes to show that he had told Plaintiff to show up to the training. But, as discussed below, those notes are inadmissible.  Thus, it is undisputed for summary judgment purposes that Mr. Yates did not tell Plaintiff to attend this training.

decision: (1) Mr. "Ford requested that [Plaintiff] be removed from the Halliburton contract," (2) Mr. Strickland believed Plaintiff had not adequately trained his officers on temperature check procedures; (3) Mr. Strickland believed Plaintiff flouted COVID-19 protocols by failing to wear a mask or promptly report his exposure; (4) Mr. Strickland believed Plaintiff had recent performance problems, including his refusal to do payroll and his choice to send another employee home; and (5) Mr. Strickland believed that Plaintiff skipped the Saturday training without notice.[10]  Strickland Dec. [Doc. No. 27-1] ¶¶ 9–11.

Plaintiff did not receive any written warnings for his behavior prior to his termination.  Although Weiser has a progressive discipline policy, termination is allowed for a single offense where the behavior constitutes "a failure to follow safety rules" or a "gross inattention to duty."  *Id.* ¶ 12.  Mr. Strickland contends that Plaintiff's "egregious actions merited termination under these categories."  *Id.*  Mr. Strickland claims he did not know about Plaintiff's comments to Ms. Lee-Sutherlin when he made the decision to terminate Plaintiff, nor did his decision have any connection to Plaintiff's participation in the investigation of Mr. Culberson's complaint.

### III.   <u>Analysis</u>

After his termination, Plaintiff sued Weiser pursuant to Title VII of the Civil Rights Act of 1964 "for retaliation for reporting and opposing sexual harassment and

---

[10] Mr. Yates filled out Plaintiff's termination form, which reads: "Mike Strickland came in to do terminations for continued performance issues.  Not properly training officers for temperature checks, not coming in to assist with training when told by management."  [Doc. No. 46-22].

gender discrimination."[11]  Compl. [Doc. No. 1] ¶ 3.  Before addressing the substance of Weiser's arguments, the Court addresses Plaintiff's evidentiary challenges to the summary judgment record.

### A.    Evidentiary Issues

Federal Rule of Civil Procedure 56(c)(2) permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  When a party challenges the admissibility of an exhibit, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendments.  In this case, Plaintiff objects to (1) Mr. Yates's notes [Docs. No. 27-8, 27-14, 27-18]; (2) Ms. Lee-Sutherlin's notes [Doc. No. 27-15]; and (3) parts of Mr. Strickland's Declaration [Doc. No. 27-1].  Although the challenges implicate several pieces of evidence and raise numerous legal issues, the parties provide only scant analysis.  Nevertheless, the Court takes each challenge in turn.

### i.    Mr. Yates's Notes

First, Plaintiff challenges the admissibility of Mr. Yates's notes, attached to Weiser's summary judgment motion as Exhibits 8, 14, and 18.  Exhibit 8 apparently contains Mr. Yates's notes of events occurring on June 5, 2020.  *See* [Doc. No. 27-8].

---

[11] The parties seem to dispute whether Plaintiff has also pled a cause of action pursuant to the Oklahoma Anti-Discrimination Act.  *See, e.g.*, Joint Status Rep. [Doc. No. 12] ¶ 1.  Claims under OADA are coextensive with Title VII claims.  *See Green v. JP Morgan Chase Bank Nat. Ass'n*, 501 F. App'x 727, 731 (10th Cir. 2012); *Jones v. Needham*, 856 F.3d 1284, 1292 (10th Cir. 2017).  Because Weiser is entitled to summary judgment on Plaintiff's Title VII claim, any OADA claim would also fail.

Exhibit 14, purportedly authored by Mr. Yates, describes events that took place between June 8 and June 12.  *See* [Doc. No. 27-14].  Exhibit 18 contains (1) an April 21, 2020 email from Mr. Yates to Mr. Strickland detailing issues with Plaintiff, *see* [Doc. No. 27-18] at 1–3; (2) additional notes dated June 4, 2020 and June 19, 2020, *see id.* at 8, 11; and (3) the same notes contained in Exhibits 8 and 14, *see id.* at 4–7, 9–10.  Plaintiff contends these exhibits are not properly authenticated and contain inadmissible hearsay.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Authentication challenges can be raised at the summary judgment stage, but courts "do not require an affidavit to authenticate every document submitted for consideration at summary judgment."  *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009).  For example, "documents produced during discovery that are on the letterhead of the opposing, producing party are authentic per se."  *Id.*; *see also* Fed. R. Evid. 902 (listing types of evidence which are self-authenticating).  Exhibits may also "be sufficiently authenticated taking into consideration the '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances,' even if they do not appear on [company] letterhead."  *Law Co.*, 577 F.3d at 1171 (quoting Fed. R. Evid. 901(b)(4)).

"Although Rule 901 serves an important gatekeeping function, '[t]he bar for authentication of evidence is not particularly high.'"  *United States v. Isabella*, 918 F.3d 816, 843 (10th Cir. 2019) (quoting *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir.

2007)).  Indeed, "[a]uthentication in the evidentiary sense is not the same as authenticity from a factual standpoint."  *United States v. Keogh*, No. CR-17-290-D, 2022 WL 138692, at *1 (W.D. Okla. Jan. 14, 2022).  Once the proponent clears Rule 901's relatively low bar, further challenges about the reliability, importance, or interpretation of the evidence "go to the weight of the evidence—not to its admissibility."  *Isabella*, 918 F.3d at 844.

As an initial matter, the record contains no direct evidence from Mr. Yates.  He has provided no affidavit or declaration, nor does it appear that the parties deposed him.  Thus, the notes must be authenticated in some other manner.  Exhibits 8 and 14 contain nothing more than text typed on an otherwise blank page.  They do not appear on Weiser letterhead, nor do they contain any other types of identifying marks to suggest they are in fact Mr. Yates's notes.  The same issues exist with the June 4 and June 19 notes contained in Exhibit 18.  *See* [Doc. No. 27-18] at 8, 11.

Crucially, Weiser does not specifically address the authentication issue.  Instead, it groups all of the challenged evidence together, claiming "[t]he evidence may all be presented in an admissible format via [Lee-]Sutherlin or Strickland's deposition transcripts."  Reply [Doc. No. 54] at 10.  Weiser does not cite either deposition transcript with particularity or explain why these transcripts would be relevant to authenticating notes made by Mr. Yates.  As set forth in Weiser's trial brief, Mr. Yates cannot testify at trial because he suffered a brain injury in a motorcycle accident.  *See* [Doc. No. 38] at 10 (explaining the injury "renders [Mr. Yates] unable to participate due to cognitive and memory impairment and medication use"); *see also* Fed. R. Civ. P. 56(c)(3) (permitting the Court to "consider other materials in the record").

At best, Weiser argues the notes "qualify as records of a regularly conducted activity." Reply [Doc. No. 54] at 10 (citing Fed. R. Evid. 803(6)). Although this assertion apparently responds to Plaintiff's hearsay challenge, an exhibit is self-authenticating if it satisfies "the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person." Fed. R. Evid. 902(11). But Weiser provides no analysis on why Mr. Yates's notes satisfy the requirements set forth in Rule 806(6)(A)–(C). It does not identify anything in the record to suggest Mr. Yates's notes were "made at or near the time" of the events the notes describe. Fed. R. Evid. 803(6)(A). And although Weiser relies on Ms. Lee-Sutherlin's deposition testimony to show her notes were maintained "as part of her usual practice regarding workplace investigations," it includes no similar assertion as to Mr. Yates's notes. Reply [Doc. No. 54] at 9.

Nor does Weiser provide a certification from a custodian or otherwise qualified person. It claims Mr. Yates's "notes are based on contemporaneous personal knowledge and kept in the course of business," Reply [Doc. No. 54] at 10, but there is nothing in the record to corroborate this assertion. Instead, Weiser points to Mr. Strickland's declaration, in which he claims he "had Mr. Yates make kind of a memo of record, some notes, things like that to kind of keep track of what was going on." Strickland Dep. [Doc. No. 54-2] at 26:23-27:2. But there is no suggestion Mr. Strickland knew that Mr. Yates did in fact keep these notes, or that the challenged exhibits are true and correct copies of those notes. Based on the arguments presented by counsel, Weiser has failed to show

that Mr. Yates's notes are "admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendments.

Finally, the first three pages of Exhibit 18 contain an email purportedly sent from Mr. Yates to Mr. Strickland on April 21, 2020.[12] *See* [Doc. No. 27-18] at 1–3. Weiser has not offered any argument explaining why there is evidence sufficient to support a finding that the email is what it purports to be; its Reply is silent on this point. It is unclear at this juncture whether this exhibit could "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Because Weiser has the burden to make that showing at the summary judgment stage—and because it has failed to do so— the Court declines to consider the email. *See* Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendments.[13] The Court therefore sustains Plaintiff's objections to Weiser's Exhibits 8, 14, and 18 on authenticity grounds.

---

[12] As set forth above, Exhibit 18 also contains the notes already included as Exhibits 8 and 14. *See* [Doc. No. 27-18] at 4–7, 9–10. The relevant email exchange took place in April—roughly six weeks before the events described in these notes. Thus, the notes could not have been included as an attachment to the email, and it is unclear why Weiser included them as part of Exhibit 18. In any event, because the Court has already addressed the authenticity issues regarding these notes, it disregards them here.

[13] In any event, the Court would not find the email to be self-authenticating under Rule 901(b)(4). *Cf. Law Co.*, 577 F.3d at 1170–71 (finding error where "district court summarily disregarded [challenged] exhibits" instead of "consider[ing] authentication of each document individually"). The email contains a header, showing details about when and to whom the email was sent, and a signature block with Mr. Yates's signature. While the "From" line shows Joseph Yates's name, it does not show his email address. Weiser does not identify anything in Mr. Strickland's Declaration [Doc. No. 27-1] or deposition testimony [Doc. No. 54-2] that mentions the email, nor does Weiser identify any other evidence in the record that would bear on the email's authenticity. While the email's author appears to be familiar with the people and circumstances associated with those mentioned in Mr. Yates's notes, those notes—as explained above—have not been sufficiently authenticated. While this portion of the exhibit may present a closer call than the completely unmarked notes, the Court is not convinced "[t]he appearance,

###### ii.     Ms. Lee-Sutherlin's Notes

Next, Plaintiff challenges the admissibility of Weiser's Exhibit 15, which contains Ms. Lee-Sutherlin's notes of her June 16, 2020 phone call with Mr. Ford.  During this phone call, Mr. Ford purportedly expressed his dissatisfaction to Ms. Lee-Sutherlin about the way Plaintiff and Mr. Chasteen trained the other officers.  Plaintiff claims the exhibit contains inadmissible layered hearsay from both Ms. Lee-Sutherlin and Mr. Ford.[14] Weiser argues, *inter alia*, that Plaintiff has "fail[ed] to object that the evidence within the notes and declaration 'cannot be presented in a form that would be admissible in evidence.'" Reply [Doc. No. 54] at 9–10 (quoting Fed. R. Civ. P. 56(c)(2)).  Even if the challenged statements are hearsay as contained in the exhibit, there is no suggestion that their testimony cannot be presented in an admissible form at trial.  To be sure, Weiser has listed both Ms. Lee-Sutherlin and Mr. Ford on its witness list.  *See* Def.'s Witness List [Doc. No. 17]; Final Pretrial Rep. [Doc. No. 41] at 24–25; *see also* Fed. R. Civ. P. 56(c)(3).  Thus, the Court declines to strike Exhibit 15.

###### iii.     Mr. Strickland's Declaration

Finally, Plaintiff challenges portions of Mr. Strickland's declaration, which is attached as Weiser's Exhibit 1 [Doc. No. 27-1].  He first argues that portions of the exhibit "contain hearsay recitations of alleged conversations with Mr. Ford."  Resp. [Doc.

---

contents, substance, internal patterns, or other distinctive characteristics of the item" are sufficient to self-authenticate the email under the circumstances of this case.  Fed. R. Evid. 901(b)(4).

[14] Because Plaintiff challenges only Ms. Lee-Sutherlin and Mr. Ford's statements, *see* Resp. [Doc. No. 46] at 24, the Court confines its analysis to those portions of the exhibits.

No. 46] at 24. But, as explained above, Weiser has listed Mr. Ford as a witness so this testimony could be presented in an admissible form at trial. The Court declines to strike these portions of the declaration.

Next, Plaintiff argues the declaration contains inadmissible hearsay statements from Mr. Yates and "unnamed security guards." *Id.* The challenged portions of Mr. Strickland's declaration read:

> 6.     I traveled to the Duncan location on Saturday, June 13, 2020, and assisted in training the security guards on the temperature checks. I spoke with the security guards present. Several day shift security guards told me that [Plaintiff] had not explained the training to them like he was supposed to, and had just given them a booklet and scanning thermometer.

> 7.     [Plaintiff] did not show up to the Saturday training on June 13, 2020. Plaintiff's supervisor, Joseph Yates, told me that he had instructed [Plaintiff] to be there. . . .

> 10.    In addition to the mask [sic], COVID-19 exposure, and temperature check issues, [Plaintiff] had been involved in a string of performance problems, including sending a security guard home without pay when she was less than 5 minutes late (inconsistent with Weiser's policy). [Plaintiff] had also not been following his supervisor's instructions recently, including an incident in April where [Plaintiff] hung up on Yates and an incident in June when [Plaintiff] refused to do payroll as his supervisor instructed him.

Strickland Dec. [Doc. No. 27-1] at 3. As previously stated, Weiser's admissibility analysis groups all of the exhibits together. It makes the blanket assertion that "[t]he evidence may all be presented in an admissible format via Sutherin or Strickland's deposition transcript." Reply [Doc. No. 54]. It is unclear to the Court why these transcripts would have any bearing on the admissibility of statements allegedly made by Mr. Yates or by unnamed security guards. Accordingly, those portions of the declaration

are inadmissible hearsay to the extent that Weiser relies on them for the truth of the matter asserted.

Finally, Plaintiff argues Mr. Strickland has failed to demonstrate personal knowledge pursuant to Federal Rule of Evidence 602 with respect to paragraphs 10 and 11 of his declaration.  Paragraph 10 is set forth above, and paragraph 11 provides:

> 11.    All of these reasons—the failure [to] train security guards on temperature checks, the failure to come in on Saturday to complete the training, the failure to follow COVID-19 safety rules including wearing a mask and notifying of exposure, and the recent performance and attitude issues—led me to believe that [Plaintiff]'s employment should be terminated.

Strickland Dec. [Doc. No. 27-1] ¶ 11.  Weiser's Reply does not address the personal knowledge requirement, nor does it cite any portion of Mr. Strickland's deposition testimony with particularity.  To be sure, Weiser has not shown that Mr. Strickland has personal knowledge of the underlying facts contained in his declaration—e.g., that Plaintiff *in fact* failed to train security guards or follow safety protocols.  But because Mr. Strickland has personal knowledge of his reasons for terminating Plaintiff, the statements are not inadmissible to the extent that Mr. Strickland claims those were his motivations for terminating Plaintiff.

### B.    Title VII Retaliation

Title VII prohibits employers from discriminating against employees who have either "opposed any practice" made unlawful under the statute or "participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Plaintiff claims Weiser unlawfully retaliated against him "for reporting

and opposing [Mr. Yates's] sexual harassment and gender discrimination" during his June 10 conversation with Ms. Lee-Sutherlin.  Compl. [Doc. No. 1] ¶ 3.

Absent direct evidence of discrimination, Title VII retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework.[15]  *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Accordingly, the "employee must first present a prima facie case of retaliation, which then shifts the burden to the employer to produce a legitimate, nondiscriminatory justification for taking the disputed employment action." *Id.* at 1070–71.  If the employer does so, the burden then "shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext for discrimination." *Id.* at 1071.  Because Plaintiff cannot establish his prima facie case, the Court's analysis is confined to the first step.

"Under [the *McDonnell Douglas*] analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).  To establish his prima facie case, Plaintiff "must show (1) he engaged in protected opposition to discrimination; (2) [his employer] took an adverse employment action against him;[16] and (3) a causal connection exists between the protected activity and the adverse action. *Fischer v. Forestwood Co.*,

---

[15] Neither party argues that there is direct evidence of discrimination in this case.  The Court, like the parties, applies the *McDonnell Douglas* framework.

[16] Although the parties do not address the second element, it is clear Plaintiff's termination is an adverse employment action.  *See Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000).

525 F.3d 972, 979 (10th Cir. 2008).  "If the plaintiff does not establish a prima facie case,

his entire case fails."  *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).

Weiser primarily argues that Plaintiff fails at the third step.[17]  Title VII retaliation

claims require proof that the desire to retaliate was the but-for cause of the challenged

employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

To establish this element of his prima facie case, Plaintiff "must show that [Weiser] was

motivated to terminate his employment by a desire to retaliate for his protected activity."

*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  Weiser claims

Plaintiff has not established a causal link between his June 10 report of gender

discrimination and his termination because there is no evidence that the decisionmaker

knew about Plaintiff's protected activity.

Perplexingly, Plaintiff suggests that "knowledge" is immaterial to the causation

analysis, arguing instead that the close temporal proximity between Plaintiff's report and

his termination is sufficient.  Resp. [Doc. No. 46] at 25 ("Even Defendant's prima facie

formulation does not include 'knowledge' as an element at this stage.  The prima facie

element only requires timing to establish a causal connection at the summary judgment

stage.").  This is plainly not the case for retaliation claims.  *See, e.g.*, *Singh v. Cordle*, 936

F.3d 1022, 1043 (10th Cir. 2019) ("But a plaintiff who seeks to show causation [by

temporal proximity] still must present evidence that the decisionmakers *knew* of the

protected conduct.");  *Hinds*, 523 F.3d at 1203 ("As a prerequisite to this showing,

---

[17] Weiser halfheartedly argues that Plaintiff did not engage in protected opposition.  *See* [Doc. No. 27] at 15.  The Court assumes without deciding that Plaintiff's report to Ms. Lee-Sutherlin would satisfy the first step.

[Plaintiff] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity."); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) ("[T]o establish a causal connection, plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity." (quotation omitted)); *Wood v. Handy & Harman Co.*, 318 F. App'x 602, 606 (10th Cir. 2008) ("An essential component of causation is the decisionmaker's knowledge of the protected activity; if knowledge is lacking, then the protected act cannot be said to have caused the adverse employment action."); *Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725, 735 (10th Cir. 2006) ("While, as a general rule, temporal proximity may be sufficient to establish a causal connection between the protected activity and the adverse action, we still require a plaintiff to show that the individual who took the adverse action against plaintiff also knew of the employee's protected activity.").  The Court therefore rejects the contention that the nine-day period between Plaintiff's report and his termination is—without some indication of knowledge—sufficient to satisfy the causation element of Plaintiff's prima facie case.

As a threshold showing to the causation element, Plaintiff must proffer sufficient evidence so that a factfinder could infer that either (1) Mr. Strickland knew about his complaint of gender discrimination, or (2) Mr. Yates, "the person allegedly harboring discriminatory animus, knew and used Mr. [Strickland], the person who effected the adverse action, 'as a cat's paw to effect . . . h[is] own biased designs.'" *Montes v. Vail*

*Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (quoting *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006)).  Plaintiff has made neither showing.

### i. *Mr. Strickland*

Ms. Lee-Sutherlin denies telling Mr. Strickland or Mr. Yates that Plaintiff made a report of gender discrimination.  *See* Lee-Sutherlin Dep. [Doc. No. 27-10] ¶ 7.  Similarly, Mr. Strickland claims he "did not know what [Plaintiff] had told [Ms. Lee-Sutherlin] regarding her investigation into another officer's complaints."[18]  Strickland Dec. [Doc. No. 27-1] ¶ 14.  To be sure, these statements are not dispositive.  To survive summary judgment, however, Plaintiff must "do more than 'merely assert that the jury might' disbelieve the testimony of interested witnesses; he must present his own affirmative evidence of those facts which are contradicted by the interested testimony."  *Wood*, 318 F. App'x at 606 (quoting *Anderson*, 477 U.S. at 256–57).

The *Wood* court found the record sufficient to infer knowledge when the plaintiff presented evidence of the "conduct and statements" of the person who knew about the protected conduct.  *Id.* at 606–07.  Here, Plaintiff presents no similar evidence about Ms. Lee-Sutherlin's conduct that would cast doubt on her statements.  *Cf. id.* at 607 (finding sufficient evidence of causation where person with knowledge of protected action "was extremely angry" with plaintiff).

Nevertheless, Plaintiff claims "a jury question as to knowledge may be established by the *opportunity* to have learned of the matter."  Resp. [Doc. No. 46] at 26 (citing

---

[18] Plaintiff, the only other party to the conversation, denies telling anyone else about his conversation with Ms. Lee-Sutherlin.

*Anderson v. Phillips Petroleum Co.*, 861 F.2d 631 (10th Cir. 1988); and *Enstrom v. Beech Aircraft Corp.*, 712 F. Supp. 841, 848 (D. Kan. 1989)).   Unlike the cases he cites, however, Plaintiff has not "present[ed] his own affirmative evidence of [] facts which are contradicted by" Ms. Lee-Sutherlin and Mr. Strickland's denials.   *Wood*, 318 F. App'x at 606 (quoting *Anderson*, 477 U.S. at 256–57).

In *Enstrom*, the district court conducted a bench trial and concluded the decisionmaker "exhibited considerable animosity against Plaintiff," and "was no doubt aware that plaintiff had not provided" the company with a written complaint that would have been key in an ongoing EEOC investigation into another employee.   712 F. Supp. at 849.   Similarly, it concluded the decisionmaker could have inferred that the plaintiff refused to make a statement because he was involved in settlement negotiations with regards to the other employee's EEOC claim.   *See id.*

Unlike the decisionmaker in *Enstrom*, however, there is no evidence suggesting that Mr. Strickland harbored animosity toward Plaintiff.   Instead, he speculates that Ms. Lee-Sutherlin could have told Mr. Yates, who could have in turn told Mr. Strickland, about the report.   Plaintiff argues only that Mr. Yates and Mr. Strickland had "been communicating," and that Mr. "Yates had been providing negative information about [Plaintiff]."   Resp. at 26.   But it is not clear how Mr. Yates's conveyance of negative information about Plaintiff—including his purported failures to train guards and to show up for the Saturday training—suggests he told Mr. Strickland about Plaintiff's gender

21

discrimination complaint.[19]   It is undisputed that when Plaintiff reported Mr. Yates's gender discrimination to Mr. Strickland in January 2020, he was given an "officer of the month" award and additional responsibilities, while Mr. Yates lost responsibilities upon his return.

Plaintiff also cites *Phillips Petroleum Co.*, 861 F.2d 631.   In that case, the person who knew about the protected activity testified that he "sometimes communicated adverse job-related information by telephone after he forwarded an employee's name and work history to the hiring locations," and that "he was aware of [plaintiff]'s age discrimination charge" at the relevant time.   *Id.* at 635.   There is nothing in the record to suggest Ms. Lee-Sutherlin had a similar history of sharing information about employees' reports of discrimination.   Plaintiff provides no analysis of how *Phillips Petroleum Co.* applies to the facts of this case beyond the general proposition that "knowledge may be established by the opportunity to have learned of the matter."   Resp. [Doc. No. 46] at 26. Although he makes the blanket statement that Mr. Yates and Mr. Strickland communicated about his performance, Plaintiff has not articulated how a reasonable factfinder could conclude Mr. Strickland knew about Plaintiff's June 10 report.

### ii.   Mr. Yates

Nevertheless, Plaintiff argues that *Mr. Strickland's* knowledge of the protected activity is inapposite because he simply acted as a cat's paw for Mr. Yates.   Cat's-paw liability "refers to a situation in which a biased subordinate, who lacks decisionmaking

---

[19] This argument also necessarily assumes that Mr. Yates knew about Plaintiff's protected report. As explained below, there is not sufficient evidence in the record for a factfinder to draw this conclusion.

power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). Although often considered at the pretext stage, "the influence of the biased subordinate [may also] provide[] the causal connection the plaintiff's prima facie case requires, for even though the ultimate decisionmakers weren't biased it was still because of bias that the employee suffered the adverse action." *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 795 (10th Cir. 2014); *see also Hueston Green v. Garland*, No. 1:21-CV-00087-LF-JMR, 2024 WL 688692, at *9 n.7 (D.N.M. Feb. 20, 2024).

To succeed on a theory of cat's-paw liability at this stage, "[P]laintiff must show that there is a genuine issue of material fact that (1) [Mr. Yates] took action motivated by [retaliatory] animus; (2) [Mr. Yates] intended the action to cause an adverse employment action, and (3) [Mr. Yates]'s actions proximately caused the intended adverse employment action." *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019). Despite his heavy reliance on the cat's-paw theory, Plaintiff does not discuss these elements with particularity. Instead, he argues more broadly that Mr. Strickland's termination decision hinged on Mr. Yates's false claims about Plaintiff's performance.[20] Specifically, he contends his failure to show up to the Saturday training spurred his termination, even though Mr. Yates never told him to attend. The Court assumes without deciding that

---

[20] To the extent that Mr. Strickland relies on Mr. Ford's dissatisfaction as a reason for termination, Plaintiff argues, that dissatisfaction was similarly informed by Mr. Yates's false reports.

evidence about the Saturday training could satisfy the second and third elements of the cat's-paw inquiry.  Nevertheless, Plaintiff stumbles at the first step because he proffers no evidence that Mr. Yates was motivated by retaliatory animus.

More fundamentally, Plaintiff has not proffered evidence from which a factfinder could conclude that Mr. Yates *knew* about the protected report.  Most of the cited evidence pertains to events that occurred before Plaintiff made his June 10 report.  Necessarily, this evidence cannot demonstrate that Mr. Yates harbored a discriminatory animus on the basis of Plaintiff's yet-unmade claim of gender discrimination.[21]  Instead, the proffered evidence paints a picture of ongoing tension between Plaintiff and Mr. Yates that arose weeks before the protected action occurred.  But Mr. Yates's "alleged prior mistreatment of Plaintiff is not evidence that []he was aware of Plaintiff's formal complaints."  *Singh*, 936 F.3d at 1043.  "Rather, it is evidence that, even without knowing of Plaintiff's formal complaints, [Mr. Yates] was inclined to" seek Plaintiff's termination "for the slightest reason."  *Id.*

For example, Plaintiff contends Mr. "Yates knew at least by June 4 that he was being investigated for gender discrimination and he attributed the investigation to [Plaintiff]."  Pl.'s UMF ¶ 1(A).  But Mr. Yates was not being investigated for gender discrimination at this time; the relevant investigation was spurred by Mr. Culberson's complaints of racial discrimination.  In any event, Plaintiff did not speak with Ms. Lee-

---

[21] Plaintiff had previously made a claim of gender discrimination around January or February 2020, several months before the protected action underlying his retaliation claim.  This earlier report is not the basis for his retaliation claim.  *See* Compl. [Doc. No. 1] ¶ 10 ("On or around June 10, 2020, Plaintiff participated in protected activity when he" told Ms. Lee-Sutherlin "that Joseph Yates favored women security officers . . . .").

Sutherlin until June 10, which is when he reported the gender discrimination at the heart of the retaliation claim.  So Mr. Yates's beliefs on June 4—before the protected action occurred—are not relevant to the causation inquiry.[22]  Additionally, the fact that Ms. Lee-Sutherlin "told [Mr. Yates] he was part of the investigation and a complaint" is not enough for a reasonable factfinder to infer that she disclosed Plaintiff's report of gender discrimination, which was made as part of an unrelated investigation.[23]  Lee-Sutherlin Dep. [Doc. No. 46-3] at 37:21–25.

Plaintiff also relies heavily on Mr. Yates's comment to Plaintiff that the two men needed "to get aligned," and that they "had to start working together, because if [they] weren't going to work together, it was going to be either [Plaintiff's] job or [Mr. Yates's] job."  Pl. Dep. [Doc. No. 46-1] at 161:21–162:1.  Plaintiff claimed this conversation occurred "like two weeks before [his termination]," again before he engaged in any protected activity.[24]  Likewise, at some point Mr. Yates told Plaintiff that "Robert

---

[22] In a footnote, Plaintiff conclusorily claims: "Yates' belief is enough; actual knowledge is not required."  Resp. [Doc. No. 46] at 26 n.2.  This argument is underdeveloped and insufficient to carry Plaintiff's burden at the prima facie stage.

[23] Similarly, Plaintiff claims Mr. Yates "knew about the investigation and made statements indicating he knew one subject of the investigation was his gender bias."  Pl.'s Resp. to Def.'s UMF ¶ 47.  But the cited deposition testimony begins by asking what Mr. Yates knew "in the weeks prior to the June 10th interviews" and "shortly before the interviews"—before the protected action occurred.  Pl. Dep. [Doc. No. 46-1] at 181:22–182:8.

[24] As set forth in his Response, Plaintiff claims Mr. Yates told him: "I know you complained about me to Robert and Mike, and we better get aligned . . . or it was going to be my job on the line or his [Yates'] job on the line."  Pl.'s UMF ¶ 1(B) (citing Pl. Dep. [Doc. No. 46-1] at 161:17–162:8, 198:25–199:19) (alterations in original).  This is a glaring mischaracterization of the record.  Plaintiff cobbles together part of his own deposition testimony with a question from counsel *posed 35 pages later* to make it appear as if Mr. Yates's comments about getting aligned were tied to Plaintiff's earlier complaints to Mr. Strickland and Mr. Bullock.  In fact, counsel's

Bullock . . . had told [Mr. Yates] that [Mr. Yates] was his guy, it didn't matter what happened, they were going to protect him." Pl. Dep. [Doc. No. 46-1] at 162:5–8. But there's no indication this conversation occurred before Plaintiff's protected activity, or that Mr. Bullock had any hand in terminating Plaintiff. Its materiality to the causation analysis is not apparent to the Court, and Plaintiff provides no further clarity.

The Response also highlights Mr. Yates's angry phone call to Plaintiff on June 10.[25] Unlike the evidence previously discussed, the phone call occurred after Plaintiff made his protected report. But it is undisputed that *Mr. Yates* did not meet with Ms. Lee-Sutherlin until the day after this phone call. *See* Pl's UMF ¶ 1(D); [Doc. No. 46-18]. Plaintiff proffers no evidence that Mr. Yates and Ms. Lee-Sutherlin communicated at any point before their June 11 meeting. Accordingly, the mere existence of the phone call is insufficient to allow reasonable factfinder to infer that Mr. Yates knew about Plaintiff's protected report.

Finally, Plaintiff claims Mr. Yates fed Mr. Strickland false negative information about him, including the missed Saturday training. The Saturday training and Mr. Yates's subsequent report to Mr. Strickland both occurred after Plaintiff made his report, and after Mr. Yates met with Ms. Sutherlin. But viewed in the context of the entire

---

question reads: "You don't remember him segueing from, I know you complained about me to Robert and Mike, and we better get aligned. He didn't put it that closely together, did he?" *Id.* at 199:13–16. Plaintiff's response—"Just what I had repeated, that we needed to get aligned or it was going to be my job on the line or his job on the line"—does not create the link that his counsel suggests. *Id.* at 199:17–19. The Court presumes this amalgamation was an oversight and not an attempt to mislead.

[25] It is undisputed that Mr. Yates called Plaintiff to complain that his guards had not been properly trained—the same message Mr. Yates had conveyed by email earlier that day.

record, this evidence is not sufficient to suggest that Mr. Yates either knew about the protected report or acted with a retaliatory animus—as opposed to something more benign, like mere dislike.  Accordingly, Plaintiff cannot establish the causation element of his prima facie case, and Weiser is entitled to summary judgment on his retaliation claim.[26]

## IV.   Conclusion

IT IS THEREFORE ORDERED that Weiser's Motion for Summary Judgment [Doc. No. 27] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Application to Set Defendant's Summary Judgment Motion for Oral Argument [Doc. No. 60] is DENIED as moot.

IT IS SO ORDERED this 7th day of August, 2024.

_____
**SCOTT L. PALK**
**UNITED STATES DISTRICT JUDGE**

---

[26] In light of this conclusion, the Court need not address Plaintiff's evidence of pretext.  *See Nealis v. CoxCom, LLC*, 731 F. App'x 787, 791 n.2 (10th Cir. 2018) ("[C]ourts must not conflate evidence tending to cast doubt on the employer's stated reasons for an employment decision with the plaintiff's prima facie burden of establishing an inference of retaliation in the first instance." (citing *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008)).